[Nos. C032862, C034059. Third Dist. Sept. 20, 2001.]

PAUL C. ACREE et al., Plaintiffs and Respondents, v.
GENERAL MOTORS ACCEPTANCE CORPORATION, Defendant and
Appellant.

## Counsel

Severson & Werson, Edmund T. King II, Jan T. Chilton and John B. Sullivan for Defendant and Appellant.

Farrow, Bramson, Baskin & Plutzik, Robert M. Bramson, Barry Baskin, Daniel E. Birkhaeuser, Jennifer S. Rosenberg, Kathryn A. Schofield; Lovitt & Hannan, Ronald Lovitt, J. Thomas Hannan; Chavez & Gertler and Mark A. Chavez for Plaintiffs and Respondents.

## Opinion

**DAVIS, J.**—In this class action lawsuit alleging contractual breach and unfair business practices, General Motors Acceptance Corporation (GMAC) appeals from the part of the judgment finding a breach of contract and from the trial court's orders denying its motions to vacate the judgment and for judgment notwithstanding the verdict (case No. C032862); GMAC also appeals from an order awarding attorney fees and costs to the plaintiff class

(plaintiffs) (case No. C034059).[1] This action concerns GMAC's practice of buying property damage insurance when automobile loan borrowers fail to do so themselves. Plaintiffs also appealed from the judgment, but have abandoned their appeal.

On appeal from the judgment and posttrial orders, GMAC contends that the accelerated method it used to compute earned insurance premiums was objectively and commercially reasonable as a matter of law, and that plaintiffs failed to prove proximately caused damage. We disagree. In doing so, we examine the nature of the implied covenant of good faith and fair dealing in the context of discretionary contractual power, as well as the issue of proving individual damages in the context of a class action lawsuit.

On appeal from the attorney fee and cost order, GMAC contends that plaintiffs were not prevailing parties under Civil Code section 1717, that the trial court awarded excessive fees, and that the trial court erred in awarding costs. We disagree. In doing so, we discuss the section 1717 legal standard in the context of a class action, and we also conclude that GMAC may not obtain the cost of a transcript it prepared for an unsuccessful appeal that it later used in a successful appeal.

Accordingly, we affirm the judgment, the posttrial orders, and the attorney fee and cost order.

### BACKGROUND

GMAC, a wholly owned subsidiary of General Motors Corporation, finances automobile purchases. A purchaser who buys an automobile on credit typically signs a conditional sales agreement granting the seller or its assignee a security interest in the automobile.

The standard conditional sales agreement accepted by GMAC (hereafter sales agreement or standard sales agreement) requires the borrower to maintain physical damage insurance on the automobile during the term of the sales agreement. When a borrower fails to maintain such insurance, or when a lapse in insurance coverage is detected, GMAC generally notifies the borrower and warns that it will purchase such insurance if the borrower does not; this insurance is known as collateral protection insurance (CPI).

---

[1]There have been four appeals in this matter—two prior and the two currently before us. The two prior appeals were the "Reference Appeal" (case No. C024177), and the "Injunction Appeal" (case No. C024270). The two appeals currently before us are the "Judgment Appeal" (case No. C032862), and the "Attorney Fees/Costs Appeal" (case No. C034059).

GMAC purchases CPI from Motors Insurance Company (MIC), a wholly owned subsidiary with GMAC as its only customer. In effect this makes GMAC the insurance administrator.

GMAC purchases CPI to cover the remaining term of the sales agreement. This is known as a remaining-term policy. The borrower may pay the entire premium immediately, or add the premium to the sales agreement balance and pay it off over the remaining term of the agreement with an added finance charge.

Nearly half of the CPI policies that go into effect are cancelled during their first year. Nearly a third of purchased CPI policies do not go into effect at all because the borrower notifies GMAC, within 10 days of notification of GMAC's CPI purchase, that the borrower has insurance; these policies are "flat-cancelled" and the borrower is not charged for them; the flat-cancelled borrowers were excluded from the class.

When a remaining-term CPI policy goes into effect and is cancelled before the end of its term, the borrower is refunded the unearned premium, or credited with the unearned premium if GMAC has not yet received full payment. In calculating the unearned premium to be refunded or credited, GMAC uses an accelerated method whereby more of the total premium is earned at the beginning of the policy period; thus, a CPI policy cancelled halfway through its term would result in significantly less than half of the premium being refunded or credited. This method can be contrasted, for example, with another method commonly used—the pro rata-by-time method—in which a halfway cancellation would result in half the premium being refunded or credited (i.e., proportional over time).

The underlying suit was filed as a class action in early 1993 by various GMAC borrowers for whom CPI had been purchased pursuant to the standard sales agreement. Plaintiffs claimed that GMAC charged exorbitantly for CPI by charging for certain coverages, expenses, policy lengths, and deductibles, and by calculating unearned premium refunds. Plaintiffs asked for an injunction, restitution, declaratory relief and damages. The class was subsequently certified.

GMAC filed a cross-complaint, seeking to collect amounts that members of the plaintiff class owed it under their standard sales agreements. The trial court denied GMAC's motion to certify a cross-defendant class, and GMAC unsuccessfully petitioned this court for a writ of mandate.

Trial began in May 1995. A jury determined plaintiffs' breach of contract claim. The rest of plaintiffs' claims—for violation of the unfair competition law (Bus. & Prof. Code, § 17200), unjust enrichment and declaratory relief—were deemed equitable in nature and the trial judge heard those simultaneously.

In a special verdict covering liability on the breach of contract claim, the jury found that GMAC breached the standard sales agreement by the accelerated method it used to compute unearned premium refunds. The jury also found that GMAC did not breach the standard sales agreement by charging for certain coverages, expenses, policy lengths, and deductibles regarding CPI.

In a special verdict on damages, the jury found that plaintiffs had suffered actual damages in the "total amount" of $1,863,187.16 on the contract breach.

On the remaining equitable claims, the trial court found that GMAC had engaged in two unfair business practices: imposing finance charges on a remaining-term CPI policy; and inadequately disclosing to borrowers the method it used to calculate premium refunds or credits. The trial court issued an injunction enjoining GMAC from engaging in these two practices. In a prior appeal (case No. C024270), we reversed this injunction order in an unpublished decision (hereafter the Injunction Appeal).

In its judgment, the trial court added approximately $1.2 million in prejudgment interest to the damage figure found by the jury, for a total judgment of $3,074,307.65. The court denied the plaintiffs' equitable claims, and denied GMAC any relief on its cross-complaint. The court also denied GMAC's motions to vacate the judgment and for judgment notwithstanding the verdict.

In a postjudgment order, the trial court found plaintiffs to be the prevailing party and awarded them attorney fees of approximately $3.6 million and costs of about $155,000. The court also denied GMAC's cost request of $31,488 for a reporter's transcript that was originally prepared for its unsuccessful Reference Appeal but was incorporated by reference in the Injunction Appeal.

## Discussion

### *The Judgment Appeal (Case No. C032862)*

#### 1. *The Accelerated Method for Computing Earned Premiums and Hence Premium Refunds*

Under the standard sales agreement, when a borrower fails to maintain property damage insurance on the purchased automobile, GMAC is authorized to obtain CPI. As we noted in our opinion in the Injunction Appeal, the standard sales agreement leaves the specific terms of the CPI policy to GMAC's reasonable discretion, including the method for computing premium refunds or credits upon cancellation. Because the standard sales agreement does not *expressly* cover the method for calculating premium reimbursement but leaves that method to GMAC's *discretion*, the issue of whether GMAC breached the standard sales agreement involves whether GMAC breached the *implied* covenant of good faith and fair dealing. ■ " 'Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.' (Rest.2d Contracts, § 205.)"[2] This covenant particularly applies where, as here, the contract gives one party a discretionary power affecting the rights of the other.[3]

GMAC concedes the trial court properly instructed the jurors on the implied covenant, telling them in part:

"A contract may give one party a discretionary power affecting the rights of another party. . . . Th[is] discretionary power must be exercised in accordance with reasonable standards . . . .

"In determining whether a party given a discretionary power has breached the implied promise of good faith and fair dealing, you may consider whether [¶] . . . [¶] . . . [t]he party's conduct was *objectively unreasonable.* . . ." (Italics added.)

"The meaning of the implied promise of good faith and fair dealing depends on the express terms of the contract and the *legitimate expectations* of the parties arising from those terms." (Italics added.)

■ GMAC maintains that it did not breach the implied covenant because the accelerated method for computing earned premiums and hence any premium refunds is objectively reasonable as a matter of law.

---

[2]*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683 [254 Cal.Rptr. 211, 765 P.2d 373] (*Foley*).

[3]*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372 [6 Cal.Rptr.2d 467, 826 P.2d 710] (*Carma*).

GMAC initially notes our statement in the Injunction Appeal opinion that GMAC uses "an accelerated earnings rate whereby more of the total premium is credited to the beginning of the policy period when the value of the insured automobile, and thus the risk of loss, is greater than at the end of the policy period." Along similar lines, GMAC quotes the trial court's observation, in its statement of decision, that the evidence established a "strong business justification" for computing earned premiums by an accelerated method because the risk of physical damage is greater at the beginning of the policy term and diminishes throughout the course of the term.

For purposes of establishing the objective reasonableness of the accelerated method as a matter of law and thus overturning the jury verdict, GMAC reads too much into our statement and that of the trial court. While these statements concede the reasonableness of the accelerated method in theory, they cannot be stretched to concede the reasonableness, as a matter of law, of the particular accelerated method GMAC used here. The "accelerated method" does not refer to just one method; varying accelerated methods exist with varying accelerations.

One key measure of reasonableness, for example, is how well GMAC's accelerated method matched the premium earned to the risk insured. Substantial evidence showed a mismatch in this face-off, including evidence of CPI's excessive profitability; collection of premiums based on higher loan balances but paying the vast majority of claims based on much lower repair costs; use of the pro rata-by-time method to compute premium refunds for cancelled CPI policies with a term of one year or less; and purchase of multiyear remaining-term policies with the entire premium added to the outstanding loan, even though nearly 80 percent of CPI policies either never went into effect or were cancelled within the first year.

GMAC also argues that it could not disappoint any "legitimate expectations" arising from the express terms of the standard sales agreement because that agreement did not mention any method for computing premium refunds; furthermore, as noted in the Injunction Appeal opinion, the standard sales agreement permits GMAC to "unilaterally decide" the method for computing such refunds.

This argument, however, suffers from problems, theoretical and practical.

Theoretically, it comes close to dispensing with the implied covenant of good faith and fair dealing. Although the standard sales agreement does not expressly mention the method for computing premium refunds, the implied covenant is just that—"implied"—and it functions because something has

not been expressly mentioned in a contract. (Of course, the implied covenant does not exist in a vacuum and is circumscribed by the purposes and express terms of a contract, and the jury was so instructed.)[4] The standard sales agreement does state expressly that if the borrower fails to maintain property damage insurance for the purchased car, GMAC will procure such insurance and the borrower must pay the premiums for it. From this, a borrower can legitimately expect that an appropriate amount of the premiums will be refunded if the insurance is ended before its term. And although GMAC can unilaterally decide the premium refund method, that decision, pursuant to the implied covenant, must be a reasonable one; legitimate expectations naturally flow from this recognition.[5]

Practically speaking, the standard sales agreement states in part with respect to CPI: "**INSURANCE:** You agree to keep the vehicle insured in favor of us with a policy satisfactory to us, with comprehensive theft and collision coverage, insuring the vehicle against loss in amounts not less than the unpaid sums owed under this contract. If you fail to maintain such insurance, we may, at our option, procure such insurance . . . and you agree to pay for the insurance and finance charges on the premiums . . . ." From this provision, borrowers can legitimately expect that CPI will accord with their experience with customary property damage automobile insurance (comprehensive and collision). GMAC concedes the evidence indisputably showed that the pro rata-by-time method, also known as the actuarial method, is commonly used to compute premium refunds on automobile insurance policies for comprehensive theft and collision coverage. In fact, GMAC used the pro rata-by-time method to compute premium refunds on its "non-remaining term" CPI policies (i.e., policies issued for terms of a year or less).

Moreover, GMAC's standard sales agreement specifies that the borrower agrees to pay for CPI "according to the notice we send you." A legally required and publicly available statement on file with the Michigan Insurance Bureau states with respect to GMAC's CPI that "Return premiums will be calculated on a pro rata basis when cancelling the Policy and/or Individual Certificate." And the individual CPI certificate sent to GMAC customers states that premium refunds upon cancellation "shall be computed pro-rata under the customary pro-rata cancellation table."

GMAC cannot argue that, given the standard sales agreement's silence on the issue of the premium refund method, there can be no substantial evidence

---

[4] *Carma, supra,* 2 Cal.4th at page 373; *Foley, supra,* 47 Cal.3d at page 690; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 795 [79 Cal.Rptr.2d 273].

[5] *Carma, supra,* 2 Cal.4th at page 372.

of any legitimate expectations regarding that method. The tables can be turned on such silence. In light of the evidence of the customary automobile insurance policy and the notices just described, a borrower legitimately can expect in the face of such silence that a pro rata-by-time refund method will be used.

Nor can GMAC rely on our Injunction Appeal opinion, which concluded that the CPI certificate notice was not an unfair business practice under Business and Professions Code section 17200. As we noted in that opinion, an unfair business practice claim under section 17200 is more akin to a tort than a contract claim, and requires a finding that the public is " 'likely to be deceived' " (in the Injunction Appeal, there was evidence showing that the. term "pro rata," by itself, means pro rata-by-time, so, as we concluded, the CPI certificate notice of "pro-rata under the customary pro-rata cancellation tables" must have meant something else; in fact, these tables referenced two accelerated methods). By contrast, in this appeal, we are considering a contract claim that requires the less stringent finding of "legitimate expectation" based on the contractual terms and relationship. As we said in the Injunction Appeal, "unlike the covenant of good faith, the question whether a particular business practice is 'unfair' within the meaning of section 17200 is independent of any contractual relationship between the parties."

### 2. *Proving Damages*

GMAC contends the plaintiffs failed to prove that the contract breach involving the method for computing premium refunds proximately caused any damages. We disagree.

We first consider the issue of the *fact* of damages. The jury found that GMAC breached the standard sales agreement through the accelerated method it used to compute premium refunds upon CPI cancellation. As made clear through the posture of plaintiffs' case and the special verdicts on liability and damages, the jury found that GMAC unreasonably *overcharged* for the CPI premiums by refunding too little of the premium upon cancellation; this overcharging violated the covenant of good faith and fair dealing implied in the sales agreement. Thus, the contract breach actually caused damages.

Not so fast, argues GMAC. Plaintiffs failed to prove that the class had suffered any damages because the class *as a whole* owed GMAC more for CPI than the amount of the alleged CPI overcharges claimed by the class *as*

*a whole.* Since the evidence, however, also showed that there was a significant number of class members who had paid off their CPI balances, the trial court directed that damages be bifurcated from liability and assessed individually by checking each class member's CPI balance and the amount of CPI premiums each member had paid; a collective approach would unfairly deprive those who had paid off their CPI balances, including overpayments on which GMAC was liable, from recovering anything.

The trial court's approach to the fact of damages was proper, and maintained the class action nature of the lawsuit. A class action can be maintained even if each class member must at some point individually show his or her eligibility for recovery or the amount of his or her damages, so long as each class member would not be required to litigate substantial and numerous factually unique questions to determine his or her individual right to recover.[6]

Here, the class had a standard sales agreement with GMAC. The question of liability was amenable to class treatment. The question of damages required a check of each class member's CPI account to determine if the member could actually recover monies because of the accelerated method for computing premium refunds. This check was done and the jury awarded a "total amount" of damages to be allocated to approximately 14,000 out of 116,000 class members. The remaining class members did not share in the damages awarded because they did not cancel CPI during the class period, or because they had CPI policies covering terms of one year or less with premium refunds governed by a pro rata-by-time method, or because they did not pay enough of their CPI account to GMAC to have suffered any damages resulting from the smaller refund. As we noted in our Injunction Appeal opinion, when a CPI remaining-term policy is cancelled before the end of its multiyear term, the borrower is either refunded the unearned premium or the amount is *credited* to his account if GMAC has not yet received full payment. GMAC notes in its brief that when the Injunction Appeal opinion overturned the trial court's findings that GMAC had engaged in unfair business practices, the plaintiffs' claim for restitution and credits was undercut; consequently, the final judgment contains no provision for restitution or credits.

---

[6]*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 706, 713, 715-716 [63 Cal.Rptr. 724, 433 P.2d 732] (*Daar*); *Employment Development Dept. v. Superior Court* (1981) 30 Cal.3d 256, 266 [178 Cal.Rptr. 612, 636 P.2d 575] (*Employment Development Dept.*); *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 809, 815 [94 Cal.Rptr. 796, 484 P.2d 964] (*Vasquez*); *Collins v. Rocha* (1972) 7 Cal.3d 232, 238 [102 Cal.Rptr. 1, 497 P.2d 225] (*Collins*).

■ Where the *fact* of damages is certain, as here, the *amount* of damages need not be calculated with absolute certainty.[7] The law requires only that some reasonable basis of computation be used, and the result reached can be a reasonable approximation.[8]

■ Here, the jury was presented with a reasonable basis for computing damages resulting from use of GMAC's accelerated method for premium refunds.[9] The plaintiffs had their expert quantify the amount by which the refunds computed on a pro rata-by-time basis exceeded the refunds GMAC had actually paid class members using the accelerated method. This approach was supported by evidence that comprehensive and collision automobile insurance premium refunds are commonly, if not customarily, computed on a pro rata-by-time basis, that GMAC used this basis to compute premium refunds on CPI policies of one year or less, and that notices related to the standard sales agreement mentioned cancellation in pro rata terms.

That brings us to GMAC's final point on the issue of damages. GMAC contends the trial court erred in excluding evidence that GMAC's CPI premiums were lower because of the additional funds engendered from the accelerated method. The trial court afforded GMAC ample opportunity to present an offer of proof regarding this benefit. The best GMAC could muster was evidence that two insurance carriers had filed premium rates for two CPI policies with the California Department of Insurance based on an accelerated method, and had apparently received a 5 to 30 percent discount for one policy on this basis, and a 10 percent discount for the other.

The trial court did not abuse its discretion in excluding this evidence. As with damages, there must be a reasonable basis for quantifying offsets.[10] GMAC's CPI policy was filed with the insurance authorities in Michigan, not in California. It was speculative whether the Michigan authorities would approve a higher premium for a remaining-term CPI policy based on use of a pro rata-by-time refund method. The wide variability of the California discount rates—including a span of 25 percent (or a 600 percent difference) in one of the policies—greatly reduced their relevant punch. And GMAC did not quantify any sort of discount factor for the accelerated method it used.

We conclude the judgment and posttrial orders should be affirmed. We turn to the appeal of the order awarding attorney fees and costs.

---

[7]*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873 [274 Cal.Rptr. 168] (*GHK Associates*); *DuBarry Internat., Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 562 [282 Cal.Rptr. 181] (*DuBarry*).

[8]*GHK Associates, supra,* 224 Cal.App.3d at page 873; *DuBarry, supra,* 231 Cal.App.3d at page 562.

[9]See *DuBarry, supra,* 231 Cal.App.3d at page 562.

[10]*John Morrell & Co. v. Local Union 304A* (8th Cir. 1990) 913 F.2d 544, 557.

*The Attorney Fees/Costs Appeal (Case No. C034059)*

## 1. Attorney Fees

Pursuant to Civil Code section 1717 and an attorney fee provision in the standard sales agreement, the trial court awarded plaintiffs $3,629,275 in attorney fees on their contract action.

GMAC contends this order must be reversed because the trial court applied the wrong legal standard, the evidence is insufficient to support the order, and the amount awarded is excessive. We disagree.

### a. Legal Standard

Civil Code section 1717, subdivision (a), authorizes an award of attorney fees to a prevailing party "[i]n any action on a contract" "to enforce that contract" if the contract provides for an award of attorney fees. Subdivision (b)(1) of section 1717 states that "the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract" and shall be determined by the court.

■ "If neither party achieves a complete victory on all the contract claims, [as is the case here,] it is within the discretion of the trial court to determine which party prevailed on the contract or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees. '[I]n deciding whether there is a "party prevailing on the contract," the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources.' "[11] "[I]n determining litigation success, courts should respect substance rather than form, and to this extent should be guided by 'equitable considerations.' "[12]

The Civil Code section 1717 phrase "greater relief . . . on the contract" does not necessarily mean greater monetary relief.[13]

---

[11] *Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109 [86 Cal.Rptr.2d 614, 979 P.2d 974] (*Scott*), quoting *Hsu v. Abbara* (1995) 9 Cal.4th 863, 876 [39 Cal.Rptr.2d 824, 891 P.2d 804] (*Hsu*).

[12] *Hsu, supra,* 9 Cal.4th at page 877, italics omitted.

[13] *Sears v. Baccaglio* (1998) 60 Cal.App.4th 1136, 1154 [70 Cal.Rptr.2d 769] (*Sears*).

The trial court is given "wide discretion" in determining which party prevailed, and we will not overturn that determination "absent a clear abuse of discretion."[14]

■ GMAC's attack on the legal standard the trial court used is two-pronged. First, GMAC contends the trial court applied the "net monetary recovery" standard the plaintiffs had advocated rather than the correct comparative approach set forth by the state Supreme Court in *Hsu* and *Scott*. GMAC is mistaken.

In its attorney fee order, the trial court stated: "Pursuant to the standards set forth in Hsu[, *supra*,] (1995) 9 Cal.4th 863, plaintiffs are the prevailing party in the action on the contract. Although plaintiffs did not obtain a complete victory, they recovered the greater relief as a result of the jury's verdict. Judgment was entered in favor of plaintiffs and against [GMAC] in the sum of $3,074,307.65 and GMAC's cross-complaint was dismissed. The Court finds that, on balance, plaintiffs prevailed sufficiently on their breach of contract cause of action to justify an award of attorneys' fees under Civil Code section 1717."

In determining who was the prevailing party on the contract action, the trial court did not simply use the "net monetary recovery" standard advocated by plaintiffs. Instead, the trial court used the "standards set forth in Hsu" (i.e., the comparative approach), finding that "on balance[] plaintiffs prevailed sufficiently on their breach of contract cause of action" to have met the Civil Code section 1717 prevailing party definition of having recovered the "greater relief." Unless the record is to the contrary, we must take the trial court at its word and assume it did its duty.[15] We will look at that record when we discuss GMAC's contention on substantial evidence.

The second prong of GMAC's argument that the trial court applied the wrong legal standard is that the trial court erroneously refused to assess prevailing party status on an individual basis. Again, GMAC is mistaken.

Because only about 14,000 of the 116,000 class members were awarded damages (including only one of the four named plaintiffs), GMAC contends it prevailed on the "multiple, independent" contracts involving those who did not recover any damages.

---

[14]*Sears, supra,* 60 Cal.App.4th at page 1158.
[15]See Evidence Code section 664.

As we discussed in part 2 of the Judgment Appeal *ante*, GMAC has misperceived the nature of a class action. Briefly, a class action can be maintained even if each class member must at some point individually show his or her eligibility for recovery or the amount of his or her damages, so long as these individual issues do not overwhelm the class issues.[16] Liability was determined here on a classwide basis because the class had a standard sales agreement with GMAC. Damages were awarded in a classwide, lump-sum, net-payment amount after each class member's CPI account was assessed individually.

Nor does the present action involve "multiple, independent" contracts as GMAC argues. GMAC seeks to fall within the principle set forth in *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.*[17] In *Arntz*, a general contractor and its surety sued one another on their separate contracts and different victors emerged for each contract.[18] The court stated, "When an action involves multiple, independent contracts, each of which provides for attorney fees, the prevailing party for purposes of Civil Code section 1717 must be determined as to each contract regardless of who prevails in the overall action."[19]

*Arntz* does not apply here. It was not a class action. More importantly, the present action involves a standard sales agreement offered to a class of borrowers instead of the "multiple, independent" contracts exemplified in *Arntz*.

Nor is the federal appellate decision in *Wooldridge v. Marlene Industries Corp.* helpful to GMAC.[20] *Wooldridge* was a class action sex discrimination suit that challenged an employer's maternity leave policy, which forced pregnant employees to take prescribed leave periods.[21] The court agreed with the employer's argument that attorney "time spent litigating the individual damage claims of class members who did not receive damages [could

---

[16]*Daar, supra,* 67 Cal.2d at pages 706, 713, 715-716; *Employment Development Dept., supra,* 30 Cal.3d at page 266; *Vasquez, supra,* 4 Cal.3d at pages 809, 815; *Collins, supra,* 7 Cal.3d at page 238.

[17]*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464 [54 Cal.Rptr.2d 888] (*Arntz*).

[18]*Arntz, supra,* 47 Cal.App.4th at pages 471-475.

[19]*Arntz, supra,* 47 Cal.App.4th at page 491; accord, *Hunt v. Fahnestock* (1990) 220 Cal.App.3d 628, 630 [269 Cal.Rptr. 614].

[20]*Wooldridge v. Marlene Industries Corp.* (6th Cir. 1990) 898 F.2d 1169 (*Wooldridge*).

[21]*Wooldridge, supra,* 898 F.2d at page 1171.

not] be compensated since these persons [were] not prevailing parties within the meaning of the attorneys' fees statute."[22]

In whatever way *Wooldridge* aligns with the nature of the class action as defined by the California courts, its facts are enough to distinguish it here. The attorney fee issue in *Wooldridge* concerned the *"time spent litigating* the individual damage claims of class members."[23] *Wooldridge* encompassed extensive litigation on those claims. The same cannot be said here. In *Wooldridge*, "damage hearings" were held and the "individual employees" were called "to testify about their damage claims."[24] Numerous, substantial, and factually unique questions were directed at each employee.[25]

In short, the trial court had it right when it commented with respect to the award of attorney fees and costs: "Contrary to [GMAC's] assertions, this case has always maintained the character of a class action lawsuit and it is entirely appropriate to look at the results obtained by the class as a collective group."

### b. *Substantial Evidence*

GMAC contends that use of the *Hsu-Scott* comparative approach can lead to only one reasonable conclusion: GMAC recovered the greater relief on the contract claims and is therefore the prevailing party under Civil Code section 1717. We disagree.

GMAC tallies a score by noting that it prevailed on all of plaintiffs' contract claims (i.e., the alleged overcharges for certain CPI coverages, expenses, policy lengths, and deductibles), losing only on the claim involving its accelerated method for computing premium refunds upon CPI cancellation. Plaintiffs concede the tally but dispute its significance. They counter that the refund-based breach was one of the two major claims that prompted the lawsuit, and constituted a significant victory given the high percentage of CPI policies that are cancelled before the end of their term. In any event, the plaintiffs in *Krueger v. Bank of America* were deemed to be a prevailing party for Civil Code section 1717 purposes even though they

---

[22]*Wooldridge, supra,* 898 F.2d at page 1173.

[23]*Wooldridge, supra,* 898 F.2d at page 1173, italics added.

[24]*Wooldridge, supra,* 898 F.2d at page 1172.

[25]*Wooldridge, supra,* 898 F.2d at page 1172; see *Vasquez, supra,* 4 Cal.3d at page 809 (class action may be inappropriate if class members would be required to litigate numerous, substantial, factually unique questions to determine their individual rights to recover).

failed to prevail "on virtually all causes of action stated in their complaint."[26] The plaintiffs in *Krueger* had been exonerated from any further liability on certain guarantees, and the court said "[t]his was no hollow victory."[27] Plaintiffs' judgment on the contract was "no hollow victory" either.

GMAC cites to plaintiffs' settlement and damage proposals, and concludes that plaintiffs recovered only a 20th of what they sought. Plaintiffs say this comparison involves apples and oranges because those proposals represented total alleged overcharges combining cash and account credits, while the judgment was only in cash and represented net amounts of excess payments (i.e., net of GMAC's substantial offsets), not total overcharges.

GMAC discounts the dismissal of its cross-complaint, contending the dismissal was simply because the cross-complaint could not be pursued as a class action. The facts remain, however, that GMAC took nothing on its cross-complaint, the cross-complaint had sought all outstanding amounts that class members owed under the standard sales agreement, and plaintiffs established a substantive breach of that agreement.

Finally, GMAC claims that plaintiffs did not achieve their other litigation objectives. Plaintiffs, however, presented a declaration from an MIC official stating two items of interest: first, beginning February 19, 1996, the CPI certificate sent to GMAC's California CPI customers deleted the language that premiums would be earned pursuant to the "customary pro rata table" and specified that premiums would be earned in accordance with the "applicable special cancellation table filed with and approved by the Michigan Insurance Bureau"; and second, beginning June 1, 1996, all GMAC California customers placed with CPI receive annual (not multiyear) policy terms, and premiums earned are calculated according to a pro rata-by-time table. These are weighty changes contained in a weighty piece of evidence.

Under the *Hsu-Scott* comparative approach, we conclude there is substantial evidence to support a finding that plaintiffs obtained the "greater relief" on the contract action; accordingly, the trial court did not abuse its discretion in this respect.

---

[26]*Krueger v. Bank of America* (1983) 145 Cal.App.3d 204, 217 [193 Cal.Rptr. 322] (*Krueger*).

[27]*Krueger, supra,* 145 Cal.App.3d at page 217.

### c. *Excessive Fees*

██ GMAC claims the trial court abused its discretion by awarding plaintiffs excessive fees. We disagree.

The trial court awarded plaintiffs $3,629,275 in attorney fees.

██ "The amount of an attorney fee to be awarded is a matter within the sound discretion of the trial court. [Citation.] The trial court is the best judge of the value of professional services rendered in its court, and while its judgment is subject to our review, we will not disturb that determination unless we are convinced that it is clearly wrong."[28] A challenge to the amount of the award is upheld only if that amount "is so large or small that it shocks the conscience and suggests that passion and prejudice influenced the determination."[29]

██ The $3.6 million attorney fee award does not shock our conscience. This case has been ongoing since February 1993. It is a class action involving 116,000 class members. Its trial complexity has been succinctly demonstrated by just the number of interlocutory trips to the appellate court—four. The judge who presided at the trial made the attorney fee award, stating that "[a]fter reviewing the record, . . . $3,629,275.00 is the reasonable amount of attorneys' fees under the factors set forth in Niederer v. Ferreira (1987) 189 Cal.App.3d 1485, 1507 [234 Cal.Rptr. 779] [those factors include the nature of the litigation; its difficulty; its importance; amount of money involved; skill required; experience; attention, time and skill given]." The record supports the trial court's conclusion that "This case was vigorously litigated for more than six years. Disputed matters were thoroughly researched, briefed, and argued by highly motivated and experienced attorneys. The complex and technical nature of this case, coupled with the intensity of the litigation, required attorneys on both sides to exercise the highest degree of skill and training."

GMAC is concerned that the trial court awarded attorney fees for work on unsuccessful contract claims and on noncontract claims.

As for the unsuccessful contract claims, apportionment was unnecessary here. ██ "Attorney's fees need not be apportioned when incurred for

---

[28]*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1134 [94 Cal.Rptr.2d 448] (*Akins*).

[29]*Akins, supra,* 79 Cal.App.4th at page 1134.

representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed."[30] ██ Here, all of the contract claims involved the same contract (the standard sales agreement) and the same contractual relationship (the purchase of CPI); the accelerated method of earning premiums was presented to the jury as part of that overall contractual relationship. ██ "[L]itigation may involve a series of attacks on an opponent's case. The final ground of resolution may become clear only after a series of unsuccessful attacks. [Attorney fee] [c]ompensation is ordinarily warranted even for those unsuccessful attacks, to the extent that those attacks led to a successful claim."[31]

██ As for the noncontract claims, if an action asserts both contract and noncontract claims, Civil Code section 1717 applies only to attorney fees incurred to litigate the contract claims.[32] The trial court did not award as attorney fees $980,252 representing 3,662.25 hours spent on noncontract claims.

### 2. Costs

#### a. Costs Awarded on an Individual Basis

Keeping with its previous theme, GMAC contends that it prevailed against most of the class members (those who did not recover any damages) and three of the four named plaintiffs, and should recover costs against those plaintiffs on an individual basis.

We reject this argument for the reasons expressed in part 2 of the Judgment Appeal and briefly reiterated in part 1a of this appeal regarding the nature of a class action.

#### b. Prior Appeal Transcript Costs

██ GMAC claims the trial court erred in denying its cost request of $31,488 to cover the cost of preparing the reporter's transcript for the Injunction Appeal.

---

[30]*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129-130 [158 Cal.Rptr. 1, 599 P.2d 83] (*Reynolds*).

[31]*Akins, supra,* 79 Cal.App.4th at page 1133, citing *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1303 [255 Cal.Rptr. 704].

[32]*Reynolds, supra,* 25 Cal.3d at page 129.

A brief background is required to understand this claim. In early July 1996, GMAC appealed a May 1996 order that directed a reference and appointed a referee (Reference Appeal, case No. C024177). Shortly thereafter, GMAC appealed from the July 1996 injunction order (Injunction Appeal, case No. C024270). In its notice to prepare the reporter's transcript for the Injunction Appeal, GMAC noted that the transcript "shall be the same as the reporter's transcript already requested and paid for by GMAC" for the Reference Appeal.

We dismissed the Reference Appeal in September 1996 and awarded plaintiffs their appellate costs.

GMAC used the Reference Appeal's reporter's transcript for its successful Injunction Appeal, an appeal in which GMAC was awarded its costs in July 1998. With minor additions, GMAC used the same reporter's transcript for the two current appeals (Judgment Appeal, case No. C032862 and Attorney Fees/Costs Appeal, case No. C034059).

Appellate costs are governed by the California Rules of Court; rule 26 covers appeals from superior courts.[33] Rule 26(c) states in relevant part: "The party to whom costs are awarded may recover only the following, when actually incurred: (1) the cost of preparation of an original and one copy of any type of record on appeal authorized by these rules if the party is the appellant, . . . ; provided . . . that the expense . . . of copying parts of a prior record that could be incorporated by reference under rule 11(b), shall not be recoverable as costs unless the copying is ordered by the reviewing court . . . ." (Rule 11(b) provides that prior records may be incorporated by reference for subsequent appeals in the same case.)

Here, GMAC "actually incurred" the cost of the reporter's transcript "when" it pursued its unsuccessful Reference Appeal (and was not awarded costs), and not "when" it pursued its successful Injunction Appeal (and was awarded costs). Using rule 11(b), GMAC simply incorporated the Reference Appeal's reporter's transcript for the subsequent Injunction Appeal. As noted by plaintiffs, the "plain fact is that GMAC did not incur any transcript costs in pursuing the Injunction Appeal." Under rules 26(c) and 11(b), parties generally are not awarded costs for prior records if they can be incorporated by reference.

---

[33]*Lavine v. Jessup* (1959) 175 Cal.App.2d 136, 138 [345 P.2d 505]; 9 Witkin, California Procedure (4th ed. 1997) Appeal, section 802, page 833.

This view of California Rules of Court, rule 26(c) is bolstered when one looks at that rule's history. According to the person who originally drafted rule 26(c) for the Judicial Council, Bernard Witkin himself, that rule adopts the pattern of former Code of Civil Procedure section 1034 in stating what items are recoverable as costs.[34] Former Code of Civil Procedure section 1034 stated in part: "The party entitled to costs [on appeal], or to whom costs are awarded, may recover all amounts actually paid out by him in connection with said appeal, and the preparation of the record for the appeal . . . ."[35]

As stated in *Rules on Appeal*: "It is to be expected that a provision such as Rule 26(c) or its predecessor, which lists and narrowly limits the items, will be criticised [*sic*] on the ground that it must be strictly construed, and that other legitimate expenses incurred in unusual cases will not be recoverable. [Fn. omitted.] Some thought was given to the advisability of adding a catchall provision, such as 'any amounts specifically awarded by the reviewing court,' or 'any other expense actually incurred in good faith in the taking or prosecution of the appeal.' But it seemed wiser to retain the present conservative rule than to reward the efforts of ingenious and imaginative attorneys. [In a footnote at this point, Witkin stated:] See Christens[o]n v. Cudahy Packing Co. [(1927)] 84 Cal.App. 237, [239] [257 P. 906] . . . : 'In so limiting the recoverable costs a double purpose is served—uniformity in the charge to be imposed upon unsuccessful parties, and prevention of imposition upon such parties through unnecessary and unreasonable expenditures.' "[36]

Emphasizing the language of former Code of Civil Procedure section 1034—"amounts actually paid out . . . in connection with said appeal" (then found in former Code of Civil Procedure section 1027)—the state high court in *Turner v. East Side Canal & Irr. Co.* ruled that when the record on appeal includes a reporter's transcript that was paid for by a successful appellant for use during the trial, costs on appeal may not include anything for that transcript.[37]

---

[34]Witkin, *New California Rules on Appeal* (1944) 17 So.Cal. L.Rev. 232, 258 (hereafter *Rules on Appeal*).

[35]See Historical Note, 18A West's Annotated Code of Civil Procedure (1980 ed.) following former section 1034 (par. 4, 1933 amend.) page 145.

[36]*Rules on Appeal, supra*, 17 So.Cal. L.Rev. at pages 258-259, and footnote 277.

[37]*Turner v. East Side Canal & Irr. Co.* (1918) 177 Cal. 570, 572-574 [171 P. 299]; accord, *Regents of University of California v. Morris* (1970) 12 Cal.App.3d 679 [90 Cal.Rptr. 816] (*Morris*).

The rule of *Turner* and *Morris* was disapproved to the extent it was contrary to the situation presented in *Ralph's Chrysler-Plymouth v. New Car Dealers Policy & Appeals Bd.*[38]

In *Ralph's*, a party unsuccessfully pursued an administrative appeal. As a necessary step in that appeal, the party paid for the preparation of the administrative record. That same record was used when the party successfully obtained a superior court writ of mandate pursuant to Code of Civil Procedure section 1094.5, subdivision (a) (section 1094.5(a)). The high court in *Ralph's* upheld the trial court's award of these record preparation costs even though they had been incurred before the mandate proceeding.[39]

The *Ralph's* court emphasized section 1094.5(a)'s language that " 'If the expense of preparing all or any part of the record has been borne by the prevailing party, such expense shall be taxable as costs.' "[40] The court then reasoned: "[S]ection [1094.5(a)] makes absolutely no reference to when the expense must be borne, and there seems to be no reason to penalize a successful petitioner merely because a transcript was prepared during a trial, or prepared in the course of the administrative process so long as the transcript was essential to review and its cost allowable under the language of the applicable statute. It is not reasonable to deny Ralph's those costs it would have incurred had the record been prepared initially for the mandamus proceedings merely because the costs were incurred earlier in the litigation."[41]

We find *Ralph's* inapplicable here. *Ralph's* did not involve costs on appeal. More significantly, under the language of the applicable "statute" before us—California Rules of Court, rule 26(c)—GMAC "actually incurred" its reporter's transcript cost "when" it pursued its unsuccessful Reference Appeal and not "when" it pursued its successful Injunction Appeal. The rule 26(c) phrase "when actually incurred" also coordinates nicely with rule 11(b) that a prior record be incorporated by reference for subsequent appeals in the same case.

We realize, though, that the phrase *"when actually incurred"* is not as "appeal-specific" as former Code of Civil Procedure section 1034's language

---

[38] *Ralph's Chrysler-Plymouth v. New Car Dealers Policy & Appeals Bd.* (1973) 8 Cal.3d 792, 796-797 [106 Cal.Rptr. 169, 505 P.2d 1009] (*Ralph's*).

[39] *Ralph's, supra,* 8 Cal.3d at pages 794-796.

[40] *Ralph's, supra,* 8 Cal.3d at page 795, italics omitted.

[41] *Ralph's, supra,* 8 Cal.3d at page 796.

"all amounts actually paid out . . . *in connection with said appeal*" (italics added); furthermore, this phrase from California Rules of Court, rule 26(c) arguably could mean nothing more than ensuring that requested costs *were* actually incurred.

Nevertheless, the bright-line purposes undergirding California Rules of Court, rule 26(c)—to ensure uniformity in the costs awarded, to prevent imposition of unnecessary or unreasonable expenditures, and to discourage the efforts of ingenious and imaginative attorneys—are served by not extending *Ralph's* to the facts here.[42] A question that cannot be avoided here is whether the same reporter's transcript (or the same clerk's transcript for that matter) is recoverable as a cost in multiple appeals. Common sense, as well as California Rules of Court, rules 26(c) and 11(b), would generally say no. GMAC paid for the reporter's transcript for the Reference Appeal and lost that appeal, thereby not obtaining its cost. GMAC used that same reporter's transcript in its successful Injunction Appeal, an appeal for which it was awarded costs. Had GMAC prevailed in the Reference Appeal, it would have obtained the transcript cost and could not again seek that cost in the Injunction Appeal. Why should the outcome in the Reference Appeal determine the award of costs in the Injunction Appeal? The Reference and Injunction Appeals were independent of each other; they did not involve related reviews. As plaintiffs note, GMAC is trying to shift its transcript costs from an unsuccessful appeal to a subsequent, successful one.

GMAC counters that it "actually incurred and paid the cost" of preparing the reporter's transcript, and the transcript was "essential to review" in GMAC's successful cost-recoverable Injunction Appeal.[43] It is fair and reasonable, GMAC contends, to recover costs for the transcript in the Injunction Appeal, especially since the Reference and Injunction Appeals were undertaken only about a week apart. However, there is another way of looking at what is fair and reasonable here. With our resolution of the two current appeals, GMAC has now lost three of the four appeals it brought, using essentially the same reporter's transcript. Against this backdrop, why is it fair and reasonable for GMAC to be awarded the cost of preparing this transcript?

The point is, we think there is value in retaining the originally envisioned bright lines of California Rules of Court, rule 26(c). The awarding of appellate costs should not become yet another grist of complex litigation.

---

[42]See *Rules on Appeal*, 17 So.Cal. L.Rev. at pages 258-259, and footnote 277.
[43]See *Ralph's, supra,* 8 Cal.3d at page 796.

GMAC "actually incurred" the cost of preparing the reporter's transcript in its unsuccessful Reference Appeal, and therefore is not entitled to recover that cost in its subsequent, independent Judgment Appeal.

The trial court did not err in denying this cost request.

## DISPOSITION

The judgment, the orders denying GMAC's posttrial motions to vacate the judgment and for judgment notwithstanding the verdict, and the order for attorney fees and costs are affirmed.

Blease, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied October 17, 2001, and appellant's petition for review by the Supreme Court was denied January 16, 2002.